UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KELLY WEBB, | No. 2:15-cv-01189-KJM-EFB |
| Plaintiff, | |
| v. | ORDER |
| COUNTY OF EL DORADO; PAMELA KNORR; VERNON PIERSON; JOSEPH HARN; and DOES 1 through 50 inclusive, | |
| Defendants. | |

In this case asserting age and gender-based discrimination, the court previously granted motions to dismiss brought by the County of El Dorado (the County), Pamela Knorr and Vernon Pierson (collectively, "defendants"), with leave to amend.  ECF No. 23.  Plaintiff Kelly Webb filed her first amended complaint on January 18, 2016 as ordered.  First Amended Complaint (FAC), ECF No. 26.  Defendants now move to dismiss her amended federal claims. ECF Nos. 28-1, 29-1, 31-1.  Plaintiff opposed.  ECF No. 32.  Defendants each replied.  ECF Nos. 33, 34, 35.  The court held a hearing on March 11, 2016.  Douglas Watts appeared for plaintiff, C. Christine Maloney appeared for the County, Kristin Blocher appeared for Knorr, and John Bridges appeared for Vernon Pierson.

/////

1

1    As explained below, the motions are granted in full with leave to amend plaintiff's
2 §§ 1985 and 1986 claims.

3 I.     PROCEDURAL HISTORY

4    Plaintiff filed the original complaint against defendants Joseph Harn, Knorr,
5 Pierson, and the County on June 2, 2015, alleging four state claims, which are not at issue here,
6 and three federal claims: (1) a First Amendment claim against the County based on 42 U.S.C.
7 § 1983, (2) conspiracy to violate her rights based on age and gender based on U.S.C. § 1985, and
8 (3) neglecting to prevent the violation of her civil rights based on age and gender against all
9 defendants.  *See generally* ECF No. 1.  Plaintiff subsequently voluntarily dismissed Harn a month
10 later.  ECF No. 7.  Defendants Knorr, Pierson, and the County each moved to dismiss the federal
11 claims.  ECF Nos. 9, 10, 12.  As noted, on December 23, 2015, the court granted the motion to
12 dismiss in full with leave to amend.  Order, ECF No. 23.  Plaintiff's first amended complaint sets
13 forth seven claims: (1) violations of civil rights law, 42 U.S.C. § 1983 against defendant County;
14 (2) conspiracy to violate plaintiff's civil rights based on her gender, 42 U.S.C. § 1985 against all
15 defendants; (3) neglect to prevent violation of civil rights law, 42 U.S.C. § 1986 against all
16 defendants; (4) age discrimination under Fair Employment and Housing Act (FEHA), California
17 Government Code section 12940, *et seq.* against defendant County; (5) gender-based
18 discrimination under FEHA against defendant County; (6) retaliation under FEHA against
19 defendant County; and (7) failure to prevent discrimination and retaliation under FEHA against
20 defendant County.  At issue here are the first three federal claims.

21 II.    JUDICIAL NOTICE

22    In support of its pending motion, the County requests the court to take judicial
23 notice of the following exhibits:

24    (1) Exhibits A–E: Minutes of the County's Board of Supervisors
       (the Board) meetings;
25
       (2) Exhibit F: Resolution No. 127-2011 adopted by the Board to
26     assign responsibility for the role of County Chief Technology
       Officer to Vern Pierson;
27
       (3) Exhibit G: A staff memo by Terri Daly in support of Resolution
28     No. 127-2011;

2

   (4) Exhibit H: Excerpt of Resolution No. 015-2014 adopted by the Board to update the language in the County of El Dorado Personnel Rules;

   (5) Exhibit I: Resolution No. 199-2014 adopted by the Board on November 21, 2014, to specify the number and classification of all authorized positions for each department of the County;

   (6) Exhibit J: A staff memo by Pierson in support of Resolution No. 199-2014; and

   (7) Exhibit K: Excerpts of the County's salary schedule.

ECF No. 30, Exs. A–K.  Plaintiff does not oppose the request for judicial notice.  The documents, other than the salary schedule, are all available to the public online at the County's Board of Supervisors' website.  *See https://www.edcgov.us/BOS/*.

   Minutes of a government agency's board meeting may be judicially noticed as public records. *Sumner Peck Ranch, Inc. v. Bureau of Reclamation*, 823 F. Supp. 715, 724 (E.D. Cal. 1993).  This court previously has found a County's Board of Supervisors' resolutions and administrative decisions are judicially noticeable. *Sacramento Cty. Retired Employees Ass'n v. Cty. of Sacramento*, 975 F. Supp. 2d 1150, 1154 (E.D. Cal. 2013) (citations omitted).  Staff memoranda are also judicially noticeable. *Comm. for Reasonable Regulation of Lake Tahoe v. Tahoe Reg'l Planning Agency*, 311 F. Supp. 2d 972, 1000 (D. Nev. 2004).  Lastly, information on government agency websites is also frequently a proper subject for judicial notice. *Paralyzed Veterans of Am. v. McPherson*, No. 06-4670, 2008 WL 4183981, at *5 (N.D. Cal. Sept. 9, 2008).  The court takes judicial notice of the fact these documents, including the one excerpt, exist.

III. FACTUAL ALLEGATIONS

   Plaintiff is a 53-year-old woman without a college degree.  FAC ¶¶ 1, 39.  She worked for the County full-time from May 11, 1985 until her premature retirement in 2015. *Id.* ¶ 11.  Plaintiff was chosen by then-Chief Administrative Officer (CAO) Terri Daly to oversee the County's Information Technologies (IT) Department on February 15, 2011, and was formally appointed as acting IT Director in March 2011, and provided with a substantial pay raise by the County. *Id.*

/////

1           In July 2013, the Board unanimously voted to approve plaintiff as the permanent
2   IT Director. *Id.* ¶ 13.  A month later, the Board reversed its decision, and plaintiff became the
3   interim IT Director, allegedly because of disparaging comments made by the County's Auditor
4   Joseph Harn regarding plaintiff's professional abilities. *Id.* ¶ 14.  In the same month, former
5   County HR Director Knobelauch resigned and Knorr was appointed the new HR Director,
6   effective September 7, 2013.  Not long after defendant Pierson, the County's District Attorney
7   (DA) and Chief Technology Officer (CTO), asked plaintiff about her retirement plans. *Id.* ¶ 17.
8   Plaintiff told Pierson she had no intention of retiring. *Id.*

9           Subsequently, Pierson and Knorr met on several occasions without plaintiff to
10  discuss changing the IT Department's management structure. *Id.* ¶ 18.  Plaintiff learned from
11  David Russell, who was the Assistant IT Director at the time, that the meeting was part of a plan
12  to remove plaintiff from her interim IT Director position. *Id.*

13          Pierson asked plaintiff about her retirement plans again some time later.  He told
14  plaintiff there were "political issues brewing" within the County, and her employment future was
15  thus "not safe." *Id.* ¶ 19.  Specifically, there was "a very good chance" Joe Harn would win the
16  re-election and remain County Auditor for another four years, and, if Harn were re-elected,
17  Pierson said plaintiff would likely lose her job. *Id.*  Pierson urged plaintiff to "think about [her]
18  options" and move out of IT into another department, because "sometimes bad things happen to
19  good people." *Id.*

20          On the same day, plaintiff met with Daly and, later on February 12, 2014, with
21  Knorr to complain about Pierson's comments, because she believed Pierson's comments were
22  discriminatory and motivated by plaintiff's age and gender. *Id.* ¶¶ 20–21.  Knorr brushed her
23  concerns aside and instead asked plaintiff if there were any positions plaintiff would be interested
24  in, other than the IT Department Director. *Id.* ¶¶ 21, 30.

25          On or about February 13, 2014, Daly informed plaintiff she had followed up with
26  Pierson regarding plaintiff's complaint. *Id.* ¶ 22.  Pierson later apologized in light of the fact that
27  plaintiff's father had recently passed away when he made his comments to her. *Id.*  However,
28  Pierson continued to pressure plaintiff to leave the IT Department. *Id.*

4

Daly later spoke up for the County's employees who had been subject to workplace treatment such as favoritism, ageism, sexism, harassment, and retaliation, at a public Board meeting on May 13, 2014. *Id.* ¶¶ 23–24. Prior to that meeting, Daly had also drafted and circulated a memorandum to the Board members. *Id.* ¶ 24. The memorandum stated many County employees worked in fear of bullying, retaliation, and losing their jobs. *Id.* At the meeting, plaintiff, and another County employee Mike Applegarth, spoke as well about the culture of bullying, harassment and retaliation in the County that they perceived. *Id.* ¶ 25.

Meanwhile, also in May 2014, Daly informed plaintiff that Knorr would be recruiting applicants for the IT Director position, and plaintiff would need to compete for the position with others. *Id.* ¶ 26. In June 2014, Pierson told plaintiff the same. Both Knorr and Pierson told plaintiff she did not "have what it takes to take the team to the Super Bowl." *Id.* ¶¶ 26–27. The County's decision to recruit competitively was a reversal from its previous decision, which had allowed plaintiff to waive a "competitive recruitment process" given plaintiff's abilities and performance demonstrated over the years. *Id.* ¶ 15.

Meanwhile, the Board removed Daly from her role in implementing the County's "Cultural Assessment" and "Respectful Workplace" projects, and, with Knorr and Pierson, pressured Daly to reprimand Assistant County CAO Kim Kerr in an effort to terminate Kerr. *Id.* ¶ 28. Daly refused to reprimand Kerr as Daly believed Kerr had done nothing wrong. *Id.* Daly resigned in November 2014. *Id.* Applegarth went out on state disability due to stress soon after, allegedly because Harn had retaliated against and threatened him. *Id.* ¶ 29.

Between June 16, 2014 and July 31, 2014, the County's "Respectful Workplace Special Master" complaint and review process opened. *Id.* ¶ 30. Plaintiff met with Knorr and Mary Egan from MRG Consulting, the County's Cultural Assessment vendor. *Id.* Rather than discussing the work culture, Egan asked plaintiff questions about the IT Director recruitment and plaintiff's qualifications with respect to the position. *Id.* At the conclusion of the meeting, Knorr asked plaintiff to let her know whether there were any other positions plaintiff would be interested in. *Id.*

/////

1         In June 2014, Knorr and Egan met with Russell, the Assistant IT Director. *Id.* ¶
2  31.  Russell told plaintiff later the meeting was to ask the IT staff what they felt was important to
3  see in a new IT Director.  *Id.*  In July 2014, plaintiff met with Lisa Sullivan from MRG
4  Consulting with respect to the cultural assessment; during the interview, plaintiff learned Sullivan
5  would be interviewing plaintiff's entire staff as well.  *Id.*  Sullivan set up the meetings with
6  plaintiff's staff through Russell, without plaintiff's knowledge.  Later when plaintiff met with
7  Sullivan again, Sullivan told her the meetings with plaintiff's staff would gather information for
8  the IT Director recruitment.  *Id.* ¶ 33.

9         In July 2014, Knorr re-wrote a portion of the County IT Director position's job
10 prerequisites, removing language from the posting whereby applicants, like plaintiff, could
11 receive credit for professional experience in lieu of a college degree.  *Id.* ¶ 39.  On or about
12 July 15, 2014, Pierson told plaintiff "I warned you," but the exact context of this statement is
13 unclear.  *Id.* ¶ 35.  On July 21, 2014, the County's IT Director recruitment officially opened, and
14 plaintiff submitted her application for the position not long after.  *Id.* ¶ 38.  Russell informed
15 plaintiff he intended to apply to the position as well to "show interest" for the future.  *Id.*

16        Plaintiff was demoted from interim IT Director to Principal Administrative
17 Analyst in late August, and was informed of the demotion the day after the decision was made.
18 *Id.*  Defendants informed plaintiff she was not qualified to hold the IT Director position due to her
19 lack of a college degree.  *Id.* ¶ 42.

20        From August 27, 2014 to today, the County has employed Russell as the IT
21 Director.  Russell has no college degree.  *Id.* ¶ 43.

22        In mid-November 2014, after Daly's departure, Knorr placed Kerr on
23 administrative leave and became plaintiff's direct supervisor.  Before Kerr left, Kerr informed
24 plaintiff "[Knorr] is looking for reasons to reprimand you, so be careful."  *Id.* ¶ 44.  Plaintiff
25 subsequently retired in 2015.  *Id.* ¶ 11.
26 /////
27 /////
28 /////

IV.     LEGAL STANDARD

A complaint need contain only a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), not "detailed factual allegations," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  But this rule demands more than unadorned accusations; in response to a motion under Rule 12(b)(6) "sufficient factual matter" must make the claim at least plausible.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Conclusory or formulaic recitations of a cause's elements do not alone suffice.  *Id.* (quoting *Twombly*, 550 U.S. at 555).

A party may thus move to dismiss for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  The motion may be granted only if the complaint lacks a "cognizable legal theory" or if its factual allegations do not support a cognizable legal theory.  *Hartmann v. Cal. Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1122 (9th Cir. 2013).  In making this context-specific evaluation, this court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party."  *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  This rule does not apply to "'a legal conclusion couched as a factual allegation,'" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)), nor to "allegations that contradict matters properly subject to judicial notice," or to material attached to or incorporated by reference into the complaint.  *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988–89 (9th Cir. 2001).

Lastly, on a motion to dismiss, a court generally confines its inquiry to the four corners of the complaint.  Fed. R. Civ. P. 12(d).  However, consideration of some external facts, such as documents attached to a complaint or incorporated by reference or by way of judicial notice, will not convert a motion to dismiss into a motion for summary judgment.  *United States v. Ritchie,* 342 F.3d 903, 907–08 (9th Cir. 2003); *Parks Sch. of Bus. v. Symington,* 51 F.3d 1480, 1484 (9th Cir. 1995).

/////

/////

/////

V.  DISCUSSION

    A.  42 U.S.C. § 1985(3)

As noted, the court previously found plaintiff did not initially provide sufficient factual allegations in support of her § 1985 conspiracy claim. ECF No. 23 at 12. The court thus did not reach defendants' intra-corporate conspiracy doctrine argument. *Id.* Defendants renew their argument that the "intra-corporate conspiracy doctrine" bars any conspiracy claim. While the court grants defendants' motion on the merits, it also gives plaintiff an additional opportunity to amend and so reaches the merits of the intra-corporate conspiracy doctrine argument below.

        1.  Intra-Corporate Conspiracy

The doctrine of intra-corporate conspiracy arose initially in the antitrust context. In particular, the Supreme Court has held that concerted action by officers within a single corporate entity cannot give rise to liability for conspiracy under the Sherman Act, because "[t]he officers of a single firm are not separate economic actors pursuing separate economic interests, so agreements among them do not suddenly bring together economic power that was previously pursuing divergent goals." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769 (1984).

            a.  Private Sector Context

A number of federal circuit courts have extended the doctrine to bar § 1985 claims, as a species of conspiracy, against private corporations. These courts have reasoned that a business decision reflecting the collective judgment of two or more agents of a single business entity is one single act of that business entity and thus cannot qualify as a conspiracy as contemplated by § 1985. *See Rice v. President & Fellows of Harvard Coll.*, 663 F.2d 336, 338 (1st Cir. 1981) (Harvard College, "a single corporate entity"); *Herrmann v. Moore*, 576 F.2d 453, 454, 459 (2nd Cir. 1978) (Brooklyn Law School, described as an educational corporation); *Robison v. Canterbury Vill., Inc.*, 848 F.2d 424, 431 (3rd Cir. 1988) (privately held corporation); *Dombrowski v. Dowling*, 459 F.2d 190, 196 (7th Cir. 1972) (real estate management corporation and employee); *Baker v. Stuart Broadcasting Co.*, 505 F.2d 181, 182–83 (8th Cir. 1974) (radio broadcasting company). The Tenth Circuit, on the other hand, has concluded the doctrine "should

1    not be construed to permit the same corporation and its employees to engage in civil rights

2    violations." *See Brever v. Rockwell Int'l Corp.*, 40 F.3d 1119, 1126–27 (10th Cir. 1994). The

3    District of Columbia and the Ninth Circuits have not resolved the question of § 1985's application

4    in the private sector context. *Bowie v. Maddox*, 642 F.3d 1122, 1132 (D.C. Cir. 2011) (declining

5    to reach issue as it had not been considered by the district court); *Portman v. Cty. of Santa Clara*,

6    995 F.2d 898, 910 (9th Cir. 1993) (reviewing cases). The Fourth, Fifth, Sixth and Eleventh

7    Circuits have only addressed the issue in the public agency context, which the court addresses

8    below.

9                                    b.   Public Sector Context

10         The Supreme Court has not reached the issue of whether the defendant County, a

11   public entity, can be liable under § 1985 for a conspiracy carried out by or with its employees.

12   *See Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 372 n.11 (1979). The Ninth

13   Circuit, noted the circuit split, but also has declined to address the issue. *Portman*, 995 F.2d at

14   910. The majority of circuits to reach the issue have applied the doctrine to bar claims against

15   public entities. *See Buschi v. Kirven*, 775 F.2d 1240, 1242–43, 1253 (4th Cir. 1985) (state mental

16   hospital); *Hilliard v. Ferguson*, 30 F.3d 649, 650, 653 (5th Cir. 1994) (school board); *Hull v.*

17   *Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ.*, 926 F.2d 505, 507, 509–10 (6th Cir.

18   1991) (school board); *Wright v. Ill. Dep't. of Children & Family Servs.,* 40 F.3d 1492, 1508 (7th

19   Cir. 1994) (state agency); *Runs After v. United States*, 766 F.2d 347, 354 (8th Cir. 1985) (tribal

20   council); *Dickerson v. Alachua Cty. Comm.*, 200 F.3d 761, 763, 767–68 (11th Cir. 2000) (county

21   commission; relying on *Chambliss*, supra). Here as well, the District of Columbia Circuit, like

22   the Ninth Circuit, has not resolved the question. The remaining circuits have not applied the

23   doctrine in a public entity context.

24         *Dickerson*, *Hilliard*, and *Wright* are the most instructive cases for this court's

25   purposes here. In *Dickerson*, the Eleventh Circuit noted that the § 1985 conspiracy claim was

26   against "actors who are part of a single, public entity and who allegedly conspired to interfere

27   with civil rights." 200 F.3d at 768. The Eleventh Circuit applied the doctrine and dismissed the

28   plaintiff's § 1985(3) claim, but did not explain in detail how or whether the public entity, the

9

Alachua County Commission, should be treated differently from a corporation. In *Hilliard*, the Fifth Circuit did provide an explanation for applying the doctrine to claims against a school board:

> We do not overlook the ways in which a school board is unique and distinct from a corporation. A corporation maintains a unified face in the eyes of the law. It is in that vein that we say that a corporation is a person. A school board, however, is a collection of individuals, some fill elected positions, some are salaried workers. Still, that distinction is not dispositive. All are employees of the school board. We follow the reasoning of the other courts on this question and hold that a school board and its employees constitute a single legal entity which is incapable of conspiring with itself for the purposes of § 1985(3).

*Hilliard*, 30 F.3d at 653 (relying on *Hull*, 926 F.2d at 505).

In *Wright*, the plaintiff, a social worker employed by the Illinois Department of Children and Family Services (Department), sued the Department and thirteen individual administrators, alleging, in part, the individual defendants conspired together to deny her access to federal court in violation of § 1985. The Seventh Circuit, after reviewing the case law, also applied the doctrine in the public sector context, opined

> We believe that large bureaucratic agencies . . . are functionally the equivalent of corporations in that their employees and officials jointly endeavor to provide a product or service and reach decisions pursuant to a unified hierarchical structure. In other words, . . . the [agency] can be said to constitute only a single 'center[ ] of social or economic influence.' [citation omitted].

*Wright*, 40 F.3d at 1508. For those courts applying the doctrine in the public entity context, the emphasis is on the presence of a single entity and the joint nature of decision-making endeavors within that entity. Other circuits that have applied the doctrine in this way have engaged in similar reasoning. *See, e.g.*, *Hull*, 926 F.2d at 509–10.

        c. Exceptions to Application

Some circuits have approached certain factual scenarios by identifying exceptions to application of the doctrine, in both the private and public sector contexts, when the facts of a case fail to present a "single legal entity" at work. *See, e.g.*, *Robison*, 848 F.2d at 431 (in private sector context, court noted that exception may be maintained if defendant officer acted in a

1  personal as opposed to official capacity, or if independent third parties are alleged to have joined
2  conspiracy); *Dickerson*, 200 F.3d at 770 (in public sector context, discussing several exceptions
3  including "independent personal stake"). Specifically, courts have held or considered holding
4  corporate agents liable when they "act outside the scope of their employment, have an
5  'independent personal stake' in the corporate action, or engage in a series of discriminatory acts
6  as opposed to a single action." *Dickerson*, 200 F.3d at 770 (citing *Hartman v. Bd. of Trustees*, 4
7  F.3d 465, 469–71 (7th Cir. 1993)); *see also Buschi*, 775 F.2d at 1252 (noting exception where
8  corporate agents' actions are unauthorized, or motivated by independent personal stake in
9  achieving corporation's illegal objective); *Stathos v. Bowden*, 728 F.2d 15, 20–21 (1st Cir. 1984).

   In *Stathos*, plaintiffs brought a sex discrimination action against the Peabody
11 Municipal Lighting Commission, a governmental body, and several of its agents. 728 F.2d at 17.
12 Plaintiffs claimed the defendants' actions violated 42 U.S.C. § 1983, as well as 42 U.S.C. §
13 1985(3). *Id*. The First Circuit, while not expressly distinguishing between private and public
14 enterprises, found in the case against the government commission, that the intra-corporate
15 conspiracy doctrine applies very narrowly in the § 1985 context, and does not extend to acts that
16 go "beyond the ministerial acts of several executives needed to carry out a single discretionary
17 decision." *Id*. at 21 (citation omitted). The court in *Stathos* concluded that where the "record
18 shows that defendants took a series of actions depriving plaintiffs of salary increases; that these
19 actions involved discussions among them; that they took other concerted activity, which was
20 necessary for their actions to be effective; and that they intended the results," the doctrine should
21 not apply. *Id*. at 20. This conclusion was based on the defendants' activities, which "went
22 beyond 'a single act' of discrimination," and "involved a series of acts over time going well
23 beyond simple ratification of a managerial decision by directors," consisting of several discrete
24 actions by each of the individual defendants. *Id*. at 21.

25                d.   District Court Decisions

26     In the absence of direction from the Ninth Circuit, this court also reviewed district
27 court decisions within the circuit, which have split on the issue of whether the doctrine applies to
28 bar § 1985 cases against private or public entities. Several decisions have declined to apply the

doctrine in the private sector context. *See, e.g.*, *Washington v. Duty Free Shoppers*, 696 F. Supp. 1323, 1326 (N.D. Cal. 1988); *Elowson v. Jea Senior Living*, No. 14-02559, 2015 WL 2455695, at *4 (E.D. Cal. May 22, 2015), and also in the public sector context, *Rebel Van Lines v. City of Compton*, 663 F. Supp. 786, 792 (C.D. Cal. 1987) ("To apply the intra-corporate conspiracy exception to public entities and officials would immunize official policies of discrimination"). On the other hand, other courts have applied the doctrine to bar claims against private entities, *Hoefer v. Fluor Daniel, Inc.*, 92 F. Supp. 2d 1055, 1058–59 (C.D. Cal. 2000) (doctrine applies to § 1985 claims, unless actionable conduct is outside scope of employment), and public, *Blunt v. Cty. of Sacramento*, No. 04-1743, 2006 WL 509539, at *12 (E.D. Cal. Mar. 2, 2006) (finding "fact that the majority of circuit courts have held that the intra-corporate conspiracy doctrine should indeed apply to § 1985 actions" to be persuasive); *Rabkin v. Dean*, 856 F. Supp. 543, 551 (N.D. Cal. 1994); *Welsh v. City and Cty. of San Francisco*, No. 93-3722, 1995 WL 415127, at *3 (N.D. Cal. June 30, 1995) (following logic of *Rabkin* and applying doctrine to § 1985 claim based on alleged sex discrimination where other remedies for alleged conduct available).

Of these district court cases, this court finds the *Rabkin* decision provides the most thorough discussion of its reasoning and is the most helpful here. In *Rabkin*, the Berkeley City Auditor brought claims including a § 1985 claim against the City and members of its City Council. 856 F. Supp. at 546. The plaintiff brought suit after the City Council failed to approve a proposed equity and cost of living increase for her. *Id*. The five individually named defendant Councilmembers either voted against the proposed increases or abstained from voting. *Id*. In her action, the plaintiff alleged that the City Council singled her out for adverse salary decisions. *Id*. The court found the intra-corporate conspiracy doctrine applied, barring a § 1985 claim. *Id*. at 551. After noting the circuit split, the court in *Rabkin* found "persuasive the rationale supporting application of the intra-corporate conspiracy doctrine to bar a Section 1985 claim . . . ." *Id.* at 552. Specifically, it found that the doctrine bars a § 1985 claim "where the conspiratorial conduct challenged is essentially a single act by a single governmental body acting exclusively through its own officers, each acting within the scope of his or her official capacity." *Id.* The district court in *Rabkin* focused on the individual Councilmember votes at issue, observing that it "defies

common sense to render the same conduct for which a government entity is held liable, i.e., the official votes of individual councilmembers, as separate acts accomplished by separate conspiratorial actors other than the government entity." *Id*. at 552.  The court's decision in *Rabkin* exemplifies the kind of close examination of the factual allegations of a case required to make an informed decision regarding application of the intracorporate conspiracy doctrine bar.

e. Analysis

In reviewing all the cases identified above, this case appears to be most like *Stathos,* in which an exception applied, and unlike *Rabkin*.  Here, the individual defendant's acts were not votes cast in public that culminated in a single decision by the County.  While the Board did rescind plaintiff's appointment as permanent IT director, the rescission was based on Harn's disparaging comments.  Subsequently, the Board took no "corporate" action.  Rather, the individual defendants met over several months and made various plans, taking actions in some instances that did not require ratification by the County Board.  For example, defendant Pierson told plaintiff there were "political issues brewing" within the County, and her employment was not safe.  FAC ¶ 19.  On another occasion, Pierson asked plaintiff about her retirement plans, and commented that "sometimes bad things happen to good people."  *Id*.  Defendant Knorr's lack of response to the substance of plaintiff's complaint about Pierson's comment, and indirect suggestion on more than one occasion that plaintiff consider taking another job, also places the case outside the zone in which the doctrine can apply.  In addition, defendants Pierson and Knorr met on a number of occasions without plaintiff present; she learned only from Russell that the meetings were to discuss plans to remove plaintiff.  *Id.* ¶ 18.  Knorr was responsible for recruiting and hiring the IT Director; she and Pierson told plaintiff she was not qualified, though not in those exact words.  *Id.* ¶¶ 26–27.  Knorr also modified the hiring process and job description to create hurdles that, in fact, disqualified plaintiff from being eligible for the position.  *Id.* ¶ 39. Taking the allegations of the First Amended Complaint together as true, the court finds that the facts of this case do not appear to invoke the intra-corporate conspiracy doctrine as a bar to a § 1985 claim by plaintiff.

/////

13

1    Accordingly, the court does not grant defendants' motions to dismiss plaintiff's
2 § 1985 claim on this ground.

3    2.    Allegations

4    Previously, the court dismissed plaintiff's § 1985 claims based on age and gender,
5 because "classes based on age are not considered suspect for purposes of § 1985," and, for the §
6 1985 claims based on gender, plaintiff's allegations fell short of "establishing at this stage any
7 agreement or plan to deprive Ms. Webb of her rights based on her gender." Order at 11–12. The
8 facts as highlighted by the court during its discussion of the intra-corporate doctrine show at most
9 a conspiracy with respect to plaintiff's age. However, as stated, age is not a suspect class under
10 § 1985, and the court has previously dismissed the claim, allowing plaintiff to amend her claims
11 to rely on gender only. *Id.*; *see also Levy v. Cty. of Alpine*, 2016 WL 916251, at *7 (E.D. Cal.
12 Mar. 10, 2016) ("[F]or some time now, federal courts . . . have held that age discrimination
13 employment claims may not be channeled through § 1985(3)."). Pierson's disparaging
14 comments, FAC ¶ 19, and Knorr's modification of job descriptions and requirements, FAC ¶ 39,
15 are not sufficient to show defendants conspired to discriminate against Pierson because of her
16 gender. The First Amended Complaint has not stated a claim under § 1985 with respect to the
17 existence of a conspiracy to deprive plaintiff of her rights based on her gender.

18    Rule 15(a) states that leave to amend "shall be freely given when justice so
19 requires." Fed. R. Civ. P. 15(a). "Dismissal with prejudice and without leave to amend is not
20 appropriate unless it is clear . . . that the complaint could not be saved by amendment." *Eminence*
21 *Capital, L.L.C. v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). Given the court has found a
22 conspiracy claim may be supportable, the court is persuaded that plaintiff's claims may be saved
23 with further amendment if additional allegations regarding the existence of a conspiracy to
24 deprive plaintiff of her rights based on her gender can be provided. Defendants' motion to
25 dismiss plaintiff's 42 U.S.C. § 1985 claim is GRANTED with leave to amend.

26    B.    42 U.S.C. § 1986

27    "[A] cause of action is not provided under 42 U.S.C. § 1986 absent a valid claim
28 for relief under § 1985." *Trerice v. Pedersen*, 769 F.2d 1398, 1403 (9th Cir. 1985) (citing

14

1   *Mollnow v. Carlton*, 716 F.2d 627, 632 (9th Cir. 1983)).  As the First Amended Complaint fails to
2   state a claim under § 1985, plaintiff's § 1986 claim also cannot proceed.

3   Accordingly, the court GRANTS defendants' motions to dismiss plaintiff's § 1986
4   claim with leave to amend.

5   C.   42 U.S.C. § 1983

6   The court briefly reviews the relevant law here, given its prior order providing
7   more detail.  *See* Order at 6–8.

8   A municipality can inflict a constitutional injury in two ways.  *Gibson v. Cty. of*
9   *Washoe, Nev.*, 290 F.3d 1175, 1185 (9th Cir. 2002).  First, a plaintiff can show a municipality
10  itself violated someone's rights, or it directed its employee to do so.  *Id.*  Alternatively, a
11  municipality can be responsible through its deliberate indifference and omissions causing an
12  employee to commit a constitutional violation.  *Id.*  At issue here is whether a municipality, in
13  this case the County, has violated someone's right or directed its employee to do so.

14  Under the first route to liability, § 1983 imposes liability on "persons," including
15  municipalities such as the County, who, under the color of law, deprive others of a constitutional
16  right.  42 U.S.C. § 1983; *see also Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S.
17  658, 690–91 (1978).  However, a municipality is responsible for a constitutional violation only
18  when an "action [taken] pursuant to official municipal policy" caused the violation.  *Monell*, 436
19  U.S. at 691.  A formal policy arises from "a deliberate choice to follow a course of action . . . with
20  respect to the subject matter in question" by one or more officials responsible for establishing
21  final policy.  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) (plurality opinion).  But
22  the official municipal policy at issue need not be formal; it can arise from informal practices.
23  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 138 (1988) (plurality opinion) (citing *Adickes v.*
24  *S.H. Kress & Co.*, 398 U.S. 144, 167–68 (1970).

25  An informal policy arises when there is a widespread practice that, although not
26  authorized by an ordinance or an express municipal policy, is "so permanent and well settled as to
27  constitute a custom or usage with the force of law."  *Id.* (internal quotation marks omitted).  The
28  plaintiff must show more than a single constitutional deprivation, random act, or isolated event to

15

1    prove the existence of a widespread practice, *Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir.
2    1999); a plaintiff must show a pattern of similar incidents in order for the factfinder to conclude
3    that the alleged informal policy was "so permanent and well settled" as to carry the force of law,
4    *Castro v. Cty. of Los Angeles*, 797 F.3d 654, 671 (9th Cir. 2015) (citing *Praprotnik*, 485 U.S. at
5    127).
6           Here, as before, plaintiff does not plead in the First Amended Complaint a formal
7    municipal policy is responsible for her constitutional violation.  ECF No. 23 at 8.  Additionally,
8    plaintiff does not allege any facts to show an informal policy "so permanent and well settled" as
9    to carry the force of law.  *Castro*, 797 F.3d at 671.  Instead, plaintiff alleges only discrete facts,
10   such as that Daly wrote a memo stating many County employees worked in fear of bullying,
11   retaliation and losing their jobs, or the Board stripped Daly of her role in implementing certain
12   projects in retaliation for her speech and memo concerning the workplace culture.  FAC ¶¶ 24,
13   28.  These allegations by themselves and taken together do not amount to allegations of a
14   "permanent, widespread, well-settled practice or custom that constitute[d] a standard operating
15   procedure" of the County.  *Hunter v. Cty. of Sacramento*, 652 F.3d 1225, 1232–33 (9th Cir.
16   2011).
17          Plaintiff also alleges facts concerning on the one hand Pierson and Knorr, who
18   pressured Daly to reprimand Kerr, and on the other hand Harn, who threatened Applegarth.
19   However, a municipality is not liable under § 1983 based on the common law tort theory of
20   *respondeat superior*.  *Monell*, 436 U.S. at 691.  At hearing, counsel stated unequivocally that
21   plaintiff is not asserting individual-liability claims against Knorr or Pierson, but only the *Monell*
22   claim against the County.  But again, the County cannot be held liable for claims based solely on
23   the unconstitutional acts of its employees; plaintiff needs to have identified a municipal policy or
24   custom as the cause of her injury.  *Hunter*, 652 F.3d at 1232.  In sum, plaintiff's First Amended
25   Complaint continues to lack the factual allegations necessary to "support an inference of a policy
26   through custom or practice."  *Id.*
27          The court previously identified relevant case law and stated plainly what plaintiff
28   needed to allege in order to state a claim under § 1983.  Order at 6–9.  Yet, plaintiff's allegations

1 in the first amended complaint remain insufficient to establish liability under § 1983 on the basis
2 of an informal policy, and nothing before the court suggests plaintiff could further amend to cure
3 this defect. *See Eminence Capital*, 316 F.3d at 1052.

Accordingly, the court GRANTS the County's motion to dismiss on plaintiff's § 1983 claim WITHOUT leave to amend.

VI.  CONCLUSION

The court GRANTS defendants' motion to dismiss, as to plaintiff's claim under 42 U.S.C. § 1983, WITHOUT leave to amend. Defendants' motion is otherwise DENIED.

IT IS SO ORDERED.

DATED: July 25, 2016.

_____
UNITED STATES DISTRICT JUDGE